UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHRISTINE J. CHARNETZKY**,             Case No. 5:12 CV 30

         Plaintiff,                 Judge Benita Y. Pearson

   v.                                   REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

         Defendant.                 Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Christine J. Charnetzky seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This case was referred to the undersigned for the filing of a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated January 5, 2012). For the reasons given below, the undersigned recommends affirming the Commissioner's decision denying benefits.

## BACKGROUND

On October 28, 2009, Plaintiff filed applications for DIB and SSI alleging a disability onset date of January 30, 2006. (Tr. 115, 120). Her claims were denied initially (Tr. 67, 70), and on reconsideration (Tr. 78, 82, 85, 89). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 93). Born February 7, 1958, Plaintiff was 49 years old at the hearing, which was held May 3, 2011. (Tr. 17, 24). At the hearing, Plaintiff amended her alleged onset date to August 2, 2008. (Tr. 30). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 18, 24). In her Brief on the Merits,

Plaintiff only challenges the ALJ's conclusions on her mental impairments (*see* Doc. 14), and therefore waives any claims regarding the ALJ's determinations regarding physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Therefore, the Court addresses only pertinent mental health records below.

Vocational History

Plaintiff attended high school through tenth grade and earned her GED in 2007. (Tr. 52, 150). Her vocational history includes jobs as a cashier, mail room worker, medical assistant, and receptionist. (Tr. 145). These were almost exclusively part time jobs and she held the vast majority of the jobs for only a few months at most. (Tr. 145). She held positions as a medical assistant the longest, rooming patients, helping with various tasks, answering the phones, and performing other clerical duties. (Tr. 145). Plaintiff's most consistent period of employment was between 1993 and 1997, when she was going through a divorce and "had to work" prior to remarrying. (Tr. 50–51). Her most recent attempt at employment was a position as a courtesy window clerk at Discount Drug Mart in September 2008. (Tr. 429). According to her supervisor, Plaintiff had many responsibilities in that position and quit after two or three weeks, overwhelmed and stressed following the recent deaths of her four-day-old granddaughter and father-in-law. (Tr. 429).

Medical History

Plaintiff first saw treating physician Dr. Kindra Browning on March 3, 2009. (Tr. 242). At that time, Dr. Browning noted Plaintiff's depression was not controlled. (Tr. 242). Plaintiff reported she had a good appetite, but did not sleep well. (Tr. 242). Dr. Browning diagnosed depression and adjusted Plaintiff's antidepressant dosages. (Tr. 243). Dr. Browning's treatment notes from March

2

24, 2009 show Plaintiff's nerves were doing well after medication adjustments and indicate Plaintiff was sleeping well at night. (Tr. 240). The treatment notes also list Plaintiff's anxiety diagnosis. (Tr. 240). When Plaintiff saw Dr. Browning on May 5, 2009, Dr. Browning stated Plaintiff was going through significant life stressors. (Tr. 238). Plaintiff was sleeping well but had anxiety, and Dr. Browning referred her to New Life Counseling. (Tr. 238).

Plaintiff first attended New Life Counseling on July 1, 2009 and saw Licensed Professional Counselor (LPC) Barbara Wallis. (Tr. 348–49). She described the August 2, 2008 loss of her four-day-old granddaughter and indicated nervousness over her son and daughter-in-law's current pregnancy. (Tr. 346). Plaintiff stated her depression symptoms were the continuation of a long-standing condition worsening gradually over time. (Tr. 347). Plaintiff had no thoughts of hurting herself or others. (Tr. 347). LPC Wallis noted Plaintiff was anxious and tearful, felt sad, depressed, and hopeless, and took no pleasure in activities. (Tr. 349). At the appointment, Plaintiff indicated few friends and strained relationships some family members, but good relationships with her sons. (Tr. 350). Notes indicate Plaintiff's rapport was easy and her manner cooperative, but she had problems with memory and impulsiveness. (Tr. 351).  Her mood was tearful and her affect flat, but her thought processes were logical and untangential. (Tr. 351). LPC Wallis diagnosed major depression and assessed a Global Assessment of Functioning (GAF) of 51.[1] (Tr. 349). On July 7, 2009, Plaintiff was less tearful and had a flat-but-improved affect. (Tr. 352).

Plaintiff saw Dr. Browning again on July 7, 2009 and though she was still having problems

---

1. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* at 32–34.

with depression and anxiety, she was not suicidal or homicidal. (Tr. 234). A former alcoholic, Plaintiff stated she had considered drinking, but Dr. Browning helped her create a plan to follow if she was about to drink. (Tr. 234). Dr. Browning added an antidepressant medication, instructed Plaintiff to continue counseling, and referred Plaintiff to a psychiatrist. (Tr. 234).

On July 9, 2009, Plaintiff presented to Dr. Samina Zaidi for a psychiatric evaluation. (Tr. 201). Plaintiff's appearance was depressed; her mood was labile and sad; and she had a sad affect with tangential thought processes. (Tr. 203). She was talkative and her attention was good. (Tr. 203). At the evaluation, Plaintiff reported she had been depressed "all her life." (Tr. 201). In 1994, she was hospitalized for a suicide attempt, and she saw counselors intermittently. (Tr. 204). Dr. Zaidi noted a number of traumatic events in Plaintiff's past, and past substance abuse problems. (Tr. 204). Plaintiff reported feeling worthless, lacking confidence, and anxiety issues. (Tr. 201). She felt that in the last week, she "ha[d] just snapped." (Tr. 201). Her depression worsened; she refused to answer the phone or leave the house; and she lost interest in almost everything. (Tr. 201). Plaintiff also reported crying frequently, poor sleep and decreased appetite, increased feelings of guilt and worthlessness, anxiety, and poor memory. (Tr. 201).

Dr. Zaidi noted the 2008 death of Plaintiff's granddaughter as a recent stressor, stating Plaintiff was still grieving and also experienced anxiety because her son and daughter-in-law were about to have another child. (Tr. 201). Dr. Zaidi noted Plaintiff had never held jobs for very long, often feeling she was mistreated. (Tr. 202). She explained Plaintiff had a long history of depression with anxiety, adding Plaintiff was dependent, fearful of being alone, and had an addictive personality. (Tr. 202). Dr. Zaidi diagnosed bipolar disorder, dysthymia, and alcohol dependence in sustained full remission. (Tr. 203). She prescribed antidepressants and referred Plaintiff for

4

counseling. (Tr. 203).

Plaintiff followed up on psychological issues with Dr. Browning on August 11, 2009. (Tr. 232). Plaintiff reported feeling exhausted, explaining there had been another recent death in her family. (Tr. 232). At the time, Plaintiff was involved in a partial psychiatric hospitalization program three times a week. (Tr. 232). Despite recent occasional urges to drink, Plaintiff had not started drinking again, and she had no suicidal or homicidal ideation. (Tr. 232). Plaintiff reported sleeping well and having a good appetite. (Tr. 232). At a follow-up visit with Dr. Browning on September 18, 2009, Plaintiff still had no trouble with sleeping or appetite, and Dr. Browning reported Plaintiff's bipolar disorder was getting better. (Tr. 226).

Plaintiff returned to LPC Wallis at New Life Counseling on September 17, 2009. (Tr. 352). Treatment notes indicate problems with anger, impulsiveness, and depression, and Plaintiff's bipolar diagnosis. (Tr. 352). Plaintiff was tearful, and the treatment plan included Plaintiff keeping a journal and working on relaxation. (Tr. 352). On September 23, 2009, Plaintiff was still tearful but noted she had been exercising, journaling as part of therapy, and reading. (Tr. 353). On September 24, 2009, Plaintiff returned to psychiatrist Dr. Zaidi. (Tr. 205). She was angry, irritable, and restless. (Tr. 205).

LPC Wallis's records from October 1, 2009 indicate Plaintiff did not like Dr. Zaidi and did not like journaling as part of therapy. (Tr. 353). On October 8, 2009, Plaintiff told LPC Wallis her new granddaughter had been born and she felt relieved and less worried. (Tr. 353). Wallis helped her set up an email address, which Plaintiff said she needed for a job search. (Tr. 353). On October 15, 2009, Plaintiff rated her depression as a four out of ten and indicated she was taking her medication as prescribed. (Tr. 353). She reported she was doing well and wanted to move closer to

5

her family. (Tr. 353). Plaintiff's family and husband could also see she was doing better. (Tr. 353).
On October 29, 2009, Plaintiff reported she was walking two miles per day. (Tr. 354). She also
reported poor memory and concentration, coordination problems, and being able to follow directions
but losing focus. (Tr. 354). Plaintiff did say she felt better than when she first came to the office. (Tr.
354).

On October 30, 2009, Plaintiff saw Dr. Browning, who noted Plaintiff was doing much better
since Dr. Zaidi added Pristiq. (Tr. 224). Plaintiff also told Dr. Browning she was learning better
coping skills and exercising daily. (Tr. 224). Plaintiff was sleeping well and had a good appetite. (Tr.
224). She was "doing much better"; in fact, Plaintiff reported being "80-90% better". (Tr. 224). On
November 12, 2009, LPC Wallis's counseling records stated Plaintiff's depression level was a five
or six out of ten. (Tr. 354). She continued to contact her sons weekly but felt she needed a mental
break, had a tired affect, and was forgetful. (Tr. 354). On November 25, 2009, Plaintiff again told
Wallis she was disappointed with Dr. Zaidi. (Tr. 355). She reported trouble concentrating and
memory problems, but indicated medication helped control her anger. (Tr. 355). Plaintiff also
reported trouble following directions, social anxiety, and difficulty working under pressures or time
constraints, along with verbal arguments with her past employers. (Tr. 355). She rated her
depression a four and her anxiety a nine. (Tr. 355).

On November 13, 2009, Dr. Zaidi's treatment records noted Plaintiff's mood was stable once
she started taking Pristiq. (Tr. 205). She reported decreased agitation, good sleep, and no irritability.
(Tr. 205). Plaintiff saw Dr. Browning on November 17, 2009 and stated she planned to stop seeing
Dr. Zaidi for psychological treatment because she was unhappy, but she planned to continue seeing
her counselor. (Tr. 222). Dr. Browning noted Plaintiff was sleeping well at night and had a good

6

appetite. (Tr. 222). Dr. Browning stated Plaintiff would continue taking Pristiq, and she encouraged Plaintiff to find another psychiatrist. (Tr. 222). Regarding Plaintiff's wish to stop seeing Dr. Zaidi, Dr. Browning questioned whether she was entering a manic phase or had really had a bad experience with Dr. Zaidi. (Tr. 222). She transferred her to Dr. Ikem Nkanginieme (Dr. Ike) for future psychiatric care. (Tr. 222). Plaintiff returned to LPC Wallis for counseling at New Life on December 18, 2009 and reported feeling proud of herself for completing social security paperwork. (Tr. 355). She expressed concern about her lack of work and reported difficulty focusing. (Tr. 355). She rated her depression a six and her anxiety a four. (Tr. 355).

Plaintiff first presented to psychiatrist Dr. Ike on December 21, 2009. (Tr. 306). Treatment notes from that visit state Plaintiff had experienced many deaths in her family. (Tr. 306). LPC Wallis's notes from January 4, 2010, indicate Plaintiff presented to New Life Counseling with a flat, emotionless affect and decreased self-esteem. (Tr. 356). Plaintiff planned to discuss medication with Dr. Ike. (Tr. 356). Plaintiff returned to Dr. Ike on January 18, 2010, complaining of side effects from Seroquel. (Tr. 307). Plaintiff explained she had tried counseling in the past, was not suicidal, had no thoughts of harming others, and had no hallucinations or unusual beliefs. (Tr. 308). She did indicate problems with sleep and appetite, along with mood swings, and explained she had a past psychiatric hospitalization in summer 2009. (Tr. 308–09). Later records indicate Plaintiff was also hospitalized in 1994 for alcohol poisoning and in 1977 or 1978 for an overdose. (Tr. 314).

Counseling records from LPC Wallis on January 21, 2010 indicate plaintiff was not sleeping well. (Tr. 356). On February 4, 2010, Plaintiff reported increased depression and trouble sleeping. (Tr. 357). Her self-esteem was good that day, and Plaintiff planned to look into volunteering. (Tr. 357). On February 18, 2010, Plaintiff was smiling and reported she was staying busy. (Tr. 357). On

7

March 4, 2010, Plaintiff rated her depression a two out of ten. (Tr. 357). Plaintiff reported continuing to work on a project, and notes indicate she made a flower pot with silk flowers. (Tr. 357). LPC Wallis's notes show Plaintiff reported she was doing much better, seeing friends and playing cards, and "using [her] support system optimally." (Tr. 357).

Returning to Dr. Ike on March 11, 2010, Plaintiff stated her cousin had recently died in a head-on collision. (Tr. 311). Dr. Ike's notes indicate Plaintiff was doing better on Seroquel, and Plaintiff believed she was better than the last time he saw her. (Tr. 311). Plaintiff identified her family, husband, and friends as her emotional support, and stated she copes with stress by keeping busy, but also allows herself "to become down". (Tr. 312). Plaintiff had no suicidal or homicidal ideation, hallucinations, or unusual beliefs, but had sleep and appetite problems. (Tr. 313).

On March 24, 2010, Plaintiff returned to LPC Wallis at New Life. (Tr. 358). She indicated she felt depressed after being rejected for social security benefits. (Tr. 358). On April 13, 2010, Plaintiff rated her depression a three, although she expressed some trouble with family relationships. (Tr. 358). When Plaintiff saw Dr. Ike on April 15, 2010, she reported stressors, anxiety, and some depression. (Tr. 315). She felt a little worse and stated she felt helpless. (Tr. 315–16). She wanted to work on positive thinking and stated journaling and deep breathing helped her most with coping. (Tr. 316). She also identified her husband and sons as her emotional support, and stated she wanted to become closer to her granddaughters. (Tr. 316). Despite not feeling suicidal, Plaintiff expressed confusion over why she existed and reported she still was not sleeping well. (Tr. 317).

On June 1, 2010, Plaintiff saw Dr. Ike, reporting she was "doing ok on current medications" and was fairly happy. (Tr. 398). Further, Plaintiff reported her sleep and appetite were good, and she had no suicidal or homicidal ideas, hallucinations, or perceptual anomalies. (Tr. 398). Dr. Ike

8

assessed Plaintiff as fairly stable, diagnosed bipolar disorder and generalized anxiety disorder, and assigned a GAF of 60. (Tr. 398, 400). He encouraged her to attend group therapy and encouraged family support. (Tr. 398). On July 3, 2010, Dr. Ike reported Plaintiff was happy and expressed satisfaction with her medication, but she indicated some family troubles. (Tr. 401).

At New Life Counseling on June 9, 2010, Plaintiff continued to report family difficulties with her mother and sister, and rated her depression a six. (Tr. 358). On June 24, 2010, Plaintiff told LPC Wallis she was going on a cruise. (Tr. 360). On July 7, 2010, Plaintiff reported receiving a second reject letter from social security. (Tr. 360). She felt depressed, but reported doing well at a family party. (Tr. 360). Plaintiff also seemed motivated to improve her condition, stating, "I can do this" and "I will do this". (Tr. 360). On July 22, 2010, Plaintiff reported increased depression and an argument with her son. (Tr. 360). On August 5, 2010, Plaintiff reported she had talked to her sister and finished additional social security paperwork. (Tr. 360). She rated her depression an eight out of ten, indicating her depression increased because she was busy with her 11-year-old granddaughter, who was visiting. (Tr. 360).

Plaintiff saw Dr. Ike again on October 4, 2010. (Tr. 402). She was stressed and anxious and reported trouble with her husband. (Tr. 402–03). Dr. Ike indicated Plaintiff was not stable yet, but assigned an unchanged GAF of 60. (Tr. 402–03). Plaintiff next saw Dr. Ike on November 10, 2010. (Tr. 404). Plaintiff complained of low energy, but was alert and oriented and verbalized no other mental health concerns. (Tr. 404). Dr. Ike again assessed a GAF of 60. (Tr. 405).

Plaintiff returned to LPC Wallis on November 11, 2010 and reported she had gone on a trip to South Carolina, where she spent time at the beach and in the sun. (Tr. 359). Plaintiff stated she was taking her medications as prescribed. (Tr. 359). On December 8, 2010, Plaintiff presented to

Dr. Ike complaining of depression, which Dr. Ike described as "extreme." (Tr. 406). Plaintiff appeared depressed, and when Dr. Ike asked her if she was experiencing depression, "she began to cry and stated, 'very bad'". (Tr. 406). She also expressed suicidal ideation. (Tr. 406). Dr. Ike assessed a GAF of 60 and continued to encourage plaintiff to attend groups and schedule counseling sessions. (Tr. 407). On December 9, 2010, Plaintiff reported to counseling with LPC Wallis, describing difficulties with some family members. (Tr. 359). Her depression and anxiety levels had drastically increased since her last visit. (Tr. 359).

Treatment notes from New Life on December 13, 2010 state Plaintiff's husband called and told them Plaintiff was threatening suicidal ideation. (Tr. 359). He agreed to take her to the hospital. (Tr. 359). Plaintiff continued to report suicidal ideation and rated her depression an eight out of ten at a visit to New Life on January 6, 2011. (Tr. 361). Plaintiff reported her depression increased even further at her January 19, 2011 appointment with LPC Wallis, and she continued to report family difficulties. (Tr. 361). On January 31, 2011, Plaintiff presented to Dr. Ike and stated she was depressed, and very angry with her daughter-in-law, who had sent her an unkind letter several weeks earlier. (Tr. 408). Plaintiff indicated she had been talking to her counselor about the family situation. (Tr. 408). Plaintiff told Dr. Ike she was having a hard time getting up in the morning and inquired about a different antidepressant as her insurance was changing and Pristiq was too expensive. (Tr. 408). Dr. Ike reported Plaintiff's suicidal ideation "comes and goes", but indicated Plaintiff was stable. (Tr. 408). Her GAF remained unchanged at 60. (Tr. 409). Dr. Ike continued to encourage counseling. (Tr. 409). Plaintiff returned to Dr. Ike on March 2, 2011 complaining of increased stress. (Tr. 410). Plaintiff had no recent suicidal or homicidal ideation and Dr. Ike assessed her as stable, with a GAF of 60. (Tr. 410–11).

In August 2011, Plaintiff submitted additional information to the Appeals Council, which has been made part of the record. (Tr. 430–71). Some of these medical records show Plaintiff was hospitalized in June 2011 for psychiatric reasons (Tr. 436–51), but these records are not relevant to the Court's determination of whether the ALJ erred because the Court "is confined to review evidence that was available to the Secretary" and can only consider new evidence in certain circumstances. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Though Plaintiff referred to the material in her Brief on the Merits (Doc. 14, at 3), she has not shown the evidence was new and material, and that she had good cause for failing to submit the new evidence during the administrative proceedings. *See* 42 U.S.C. § 405(g)(sentence 6); *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). On June 10, 2011 – after the ALJ's June 2, 2011 decision (Tr. 19) – Plaintiff was admitted to the Aultman Hospital psychiatric unit due to depression and suicidal thoughts. (Tr. 440). But to be considered by the Court, additional records must relate to Plaintiff's medical condition on or before the date the ALJ made his decision. "Evidence of subsequent deterioration or change in condition after the administrative hearing is deemed immaterial." *Wyatt*, 974 F.2d at 685.

Daily Activities and Symptoms

Plaintiff lives in an apartment with her husband. (Tr. 153). On a daily basis, she tries "[her] best to go about [her] daily functions" but does "not [do] much". (Tr. 154). Plaintiff explained she takes care of her husband and helps take care of their dog. (Tr. 154). Before her illness, Plaintiff used to enjoy going places, socializing, and hobbies. (Tr. 154). These hobbies included designing dried floral arrangements. (Tr. 157). Now, Plaintiff claims she has no desire to do floral design. (Tr. 157). She also stated her conditions affect her sleep. (Tr. 154).

11

Plaintiff has no problems with personal care, but does need reminders to take medication. (Tr. 155). She prepares her own meals, including "small meals, pasta, grilled cheese, [and] soup", but her husband cooks for himself. (Tr. 155). Though she does not want to do housework, Plaintiff performs household chores including cleaning, laundry, and ironing. (Tr. 156). Plaintiff explained she used to feel good about housework. (Tr. 156). Because Plaintiff and her husband rent an apartment, neither of them have yard work. (Tr. 156). Plaintiff goes outside four times a week, drives, and can go out alone. (Tr. 156). She shops in stores once a week for groceries and other items. (Tr. 156). Plaintiff explained she has never been good at bill-paying, nor has she used a savings account. (Tr. 157). She also becomes easily frustrated and loses money "quite easily". (Tr. 157). Plaintiff spends time with others three to four times a week on the phone or in person and attends church twice a week; yet Plaintiff also stated she does not feel like socializing, described "extreme blow-ups" with her family, and stated from her perspective she has no friends. (Tr. 157, 160).

Plaintiff explained her impairments affect her memory and her abilities to understand, follow instructions, get along with others, complete tasks, and concentrate. (Tr. 158). She estimated she could pay attention for 10 minutes without being distracted. (Tr. 158). Plaintiff also described difficulty following instructions. (Tr. 158). Plaintiff stated she has difficulty getting along with authority figures, especially with controlling and unappreciative bosses. (Tr. 158). She described being fired after a coworker overheard her complaining about work on the phone, and another time she stormed out of an employer's office after an argument. (Tr. 159–60). Plaintiff has been fired from numerous jobs due to her inability to respond appropriately to coworkers and supervisors. (Tr. 159–60, 184, 276). She stated she handles stress and changes in routine very poorly, and indicated

12

suicidal ideation. (Tr. 159). Plaintiff indicated her mental issues worsened as of April 15, 2010. (Tr. 172). However, she indicated there had been no additional changes in her daily activities. (Tr. 174). On July 27, 2010, Plaintiff indicated she still had not improved mentally. (Tr. 186). She stated her mental illnesses do not allow her to respond well to work tasks and indicated her daily activities are very limited due to her medications. (Tr. 191).

Plaintiff's husband submitted a Third Party Function Report. As the ALJ explained, his report largely echoed Plaintiff's own reports. (*See* Tr. 17). Her husband stated Plaintiff makes the bed and does dishes and laundry without needing help or encouragement. (Tr. 178, 180). He explained he cooks his own meals, washes his own dishes, and sometimes washes his own clothes. (Tr. 178). His report states Plaintiff can prepare sandwiches or one-course meals for herself daily, though she often eats fast food. (Tr. 180). She used to cook meals for both of them and bake, but now has no desire or motivation to do so. (Tr. 180). He indicated Plaintiff does not take care of anyone or any pets, despite Plaintiff reporting she takes care of her husband and helps care for their dog. (Tr. 179; *see* Tr. 154). Before Plaintiff's impairments, her husband explained she used to do more outdoor activities and used to cook and clean more often. (Tr. 179). Additionally, he indicated she has difficulties sleeping. (Tr. 179).

Like Plaintiff's report, her husband said she has no problem with personal care but he needs to help her manage her medication. (Tr. 179–80). He said he does not need to remind her to take it, but must make sure she does not run out of her prescriptions. (Tr. 180). He also stated Plaintiff only goes outside to go to doctors, stores, and only socializes at church (Tr. 181–82), but this contradicts Plaintiff's own reports that she socializes with friends (Tr. 157). Plaintiff's husband said Plaintiff drives, but does not like to drive. (Tr. 181). He explained she has difficulty managing money, further

13

explaining Plaintiff often puts money places and has panic attacks when she cannot find it. (Tr. 181–82). Plaintiff watches movies at home on the weekends, and this has not changed since her onset date. (Tr. 182).

Describing Plaintiff's interpersonal problems, her husband stated she is very sensitive, moody, and depressing, feels as though no one cares about her, and generally wants to be secluded. (Tr. 183). Plaintiff's husband stated Plaintiff has difficulty with memory, concentration, understanding, following instructions, and getting along with others. (Tr. 183). He stated her attention span varies, and she does "ok" with written instructions (unless there are a lot of them) and short verbal instructions. (Tr. 183). He stated she does not get along well with authority figures, and explained she has been fired from previous jobs due to "[h]er attitude towards people in general." (Tr. 184). Asked to list these employers, he stated there have been too many to list. (Tr. 184). He agreed Plaintiff does not handle stress or routine changes well at all. (Tr. 184). Describing Plaintiff's mental state, her husband reported she worries about death and driving, feels no one cares about her, worries she is useless and a burden, and has poor social skills. (Tr. 184).

Residual Functional Capacity (RFC) Assessments

*Relevant Physical RFC Notes*

On January 21, 2010, consulting examiner Dr. Lokendra Sahgal evaluated Plaintiff. (Tr. 278). At the evaluation, Plaintiff claimed "she was diagnosed to have bipolar and has been on medications, was seen by a psychiatrist, *and claims she is doing fine*." (Tr. 278) (emphasis added). Though a physical evaluation, Dr. Sahgal noted Plaintiff's history of bipolar disorder and stated her mental acuity was normal. (Tr. 280). Assessing Plaintiff's physical abilities in February 2010, Dr. William Bolz noted Plaintiff can do personal care independently, prepare her own meals daily, do

14

household work, and go shopping. (Tr. 304).

*Consulting Psychologist Mental RFC Assessment*

On February 1, 2010, Dr. Tonnie Hoyle assessed Plaintiff's mental RFC. (Tr. 286–88). After reviewing Plaintiff's mental health history, Dr. Hoyle opined Plaintiff is not significantly limited in most abilities, including:

> (1) remembering locations and work-like procedures; (2) understanding and remembering very short and simple instructions; (3) carrying out very short and simple instructions; (4) performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; (sustaining an ordinary routine without special supervision; (5) working in coordination with or proximity to others without being distracted by them; (6) making simple work-related decisions; asking simple questions or requesting assistance; (7) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; (8) being aware of normal hazards and taking appropriate precautions; (9) traveling in unfamiliar places or using public transportation; and (10) setting realistic goals and making plans independently of others.

(Tr. 286–87). Dr. Hoyle also found Plaintiff moderately limited in the following abilities:

> (1) understanding and remembering detailed instructions; (2) carrying out detailed instructions; (3) maintaining attention and concentration for extended periods; (4) completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; (5) interacting appropriately with the general public; (6) accepting instructions and responding appropriately to criticism from supervisors; (7) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (8) responding appropriately to changes in the work setting.

(Tr. 286–87).

Dr. Hoyle noted Plaintiff can do personal care without problems, does not need reminders to take her medications,[2] prepares meals daily and does household chores, goes out several times a

---

2. Though Plaintiff reported she needs reminders to take her medication (Tr. 155), Plaintiff's husband reported the opposite (Tr. 180).

15

week, drives, and shops in stores. (Tr. 288). She also noted Plaintiff goes to church twice a week and socializes on the phone or in person. (Tr. 288). Additionally, she noted Plaintiff has memory and concentration problems and does not handle stress or routine-changes well. (Tr. 288). Dr. Hoyle found Plaintiff mildly limited in her activities of daily living and moderately limited in maintaining social functioning and maintaining concentration, persistence, and pace, with no episodes of decompensation. (Tr. 300). After summarizing Plaintiff's mental health history, Dr. Hoyle found Plaintiff's statements only partially credible and opined Plaintiff "is capable of mild to some moderately complex tasks in a stable environment without strict pressures to perform and only brief and superficial contact with others." (Tr. 288).

*Plaintiff's Treating Physician Opinions*

*Dr. Dunn*

On November 30, 2009, New Life Counseling psychologist Dr. Ryan L. Dunn completed a mental status questionnaire. (Tr. 273–75). He noted Plaintiff was compliant with therapy. (Tr. 277). Plaintiff's appearance was appropriate and her flow of conversation and speech normal. (Tr. 273). Dr. Dunn described her mood and affect as flat, depressed, sad, hopeless, and anxious. (Tr. 273). He explained Plaintiff is fearful, has severe depression, experiences social anxiety and paranoia, and has anger issues – somewhat controlled with medication. (Tr. 273). Dr. Dunn opined Plaintiff has normal intelligence, but short- and long-term memory problems and "[e]xtreme trouble remembering daily duties [and] following directions". (Tr. 273).

Dr. Dunn opined Plaintiff has extreme trouble remembering simple tasks and following directions. (Tr. 274). He stated she can focus for only short times and has difficulty with memory and concentration. (Tr. 274). Dr. Dunn also indicated Plaintiff does not interact well with others due

16

to social anxiety and paranoia, and further stated she does not adapt well to change. (Tr. 274). He explained Plaintiff's family distanced themselves from her due to her anxiety and negative responses. (Tr. 276). Dr. Dunn also explained Plaintiff argues with coworkers, cannot follow directions, and has been fired from numerous jobs due to anger outbursts related to her mental health issues. (Tr. 276). He also stated Plaintiff fears facing other employees and being criticized. (Tr. 276). Dr. Dunn further opined Plaintiff would have trouble working and adhering to time constraints because she has trouble focusing on even simple, routine, and repetitive tasks. (Tr. 274).

As for Plaintiff's ability to care for herself, Dr. Dunn explained Plaintiff's food preparation and personal hygiene are normal and she can complete household chores when she feels able. (Tr. 277). He indicated shopping, driving, bill paying, and hobbies are stressful for her and stated her husband helps her with "stressful duties". (Tr. 277). Dr. Dunn completed another mental status questionnaire in May 2010, essentially reiterating his previous findings regarding Plaintiff's difficulties thinking. (Tr. 328–32). At that time, Dr. Dunn added Plaintiff is unable to pay bills or take part in hobbies due to stress, anxiety, and pain. (Tr. 332).

*Dr. Ike*

On April 20, 2010, Dr. Ike wrote to Plaintiff's attorney, listing her diagnoses and opining Plaintiff is totally and permanently disabled and unable to work. (Tr. 343). Specifically, he noted she suffers from an inability to perform and complete job tasks, mood swings, poor memory, an inability to concentrate and focus, and minimal energy and motivation. (Tr. 343). Further, Dr. Ike stated Plaintiff does not respond well to constructive criticism and authority, does not respond well to stress and pressure, and has poor coping skills. (Tr. 343).

On March 16, 2011, Dr. Ike completed a mental RFC assessment and mental health

17

questionnaire. (Tr. 414–19). He listed his clinical diagnoses as bipolar disorder, generalized anxiety disorder, adjustment disorder with mixed anxiety and depressed mood, and borderline personality disorder. (Tr. 414). Dr. Ike stated Plaintiff's prognosis is fair with continued intensive counseling. (Tr. 414). Dr. Ike reported Plaintiff suffers a number of symptoms, including: appetite disturbance with weight change; decreased energy; thoughts of suicide; feelings of gilt or worthlessness; impaired impulse control; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent, intrusive recollections of traumatic experiences causing marked distress; psychomotor agitation or retardation; persistent disturbances of mood or affect; changed personality; apprehensive expectation; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsions causing marked distress; emotional withdrawal or isolation; bipolar syndrome; persistent irrational fear of a specific object, activity, or situation resulting in avoidance; intense and unstable interpersonal relationships and impulsive and damaging behavior; motor tension; emotional lability; manic syndrome; deeply ingrained, maladaptive behavioral patterns; vigilance and scanning; easy distractability; memory impairment; sleep disturbance; and recurrent severe panic attacks occurring on average at least once a week. (Tr. 415).

Regarding Plaintiff's abilities to do unskilled work, Dr. Ike opined Plaintiff has no useful ability to function in the following areas: completing a normal workday and workweek without interruptions from her psychological symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; and dealing with normal work stress. (Tr. 416). He opined she cannot meet competitive standards

18

in the following areas: remembering work-like procedures; maintaining regular attendance and being punctual within customary tolerances; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; asking simple questions or requesting assistance; and being aware of normal hazards and taking appropriate precautions. (Tr. 416). Finally, Dr. Ike found Plaintiff seriously limited, but not precluded from completing these activities: understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining attention for two-hour segments; and sustaining an ordinary routine without special supervision. (Tr. 416).

Explaining these opinions, Dr. Ike stated Plaintiff has poor memory, concentration, and focus. (Tr. 416). He further stated she has inappropriate responses to criticism, poor coping skills, frequent mood swings, minimal energy or motivation, and an inability to perform and complete job tasks. (Tr. 416). Dr. Ike believed Plaintiff has no useful ability to interact appropriately with the general public, maintain socially appropriate behavior, or use public transportation. (Tr. 417). He found she is unable to meet competitive standards in her ability to travel in unfamiliar places. (Tr. 417). And he found she is seriously limited, but not precluded from adhering to basic standards of neatness and cleanliness. (Tr. 417). Dr. Ike also opined Plaintiff cannot make any occupational or performance adjustments, and can make personal-social adjustments appropriately only 10 percent of the time. (Tr. 422–23).

On April 20, 2011, Dr. Ike wrote to Plaintiff's attorney stating, "I believe the death of her granddaughter . . . contributed significantly to the severity of the patient's depression to the point that she needed counseling at that time; and continues to need [treatment]." (Tr. 426). On August 5, 2011, Dr. Ike wrote to Plaintiff's attorney again, stating he deemed Plaintiff totally and

19

permanently disabled, and unable to sustain gainful employment. (Tr. 431).

ALJ Hearing

*Plaintiff's Testimony*

At the hearing, Plaintiff testified she left a number of jobs because she could not handle them mentally. (Tr. 28–29, 35, 44–46). Regarding her difficulties in her most recent position at Discount Drug Mart, Plaintiff testified stress never required her to take special breaks, leave work, or miss work until the day she quit the position. (Tr. 45–46). When asked if she had ever considered a job that might be less stressful, Plaintiff replied, "No." (Tr. 29). The ALJ inquired about her sporadic work history, comprised almost entirely of part time jobs she held for less than three months, apparently attempting to determine why Plaintiff was only claiming disability as of August 2008 when she claimed her mental impairments had prevented her from holding a long term job for much longer than that period. (*See* Tr. 28–35, 49–51, 54–58).

Plaintiff testified she did not think she could work any job, due to stress. (Tr. 48). The ALJ noted she had never held a job that would be considered a low-stress position and inquired whether Plaintiff thought she could do a less stressful position involving only superficial contact with others. (Tr. 48). Plaintiff believed her physical and mental impairments would keep her from performing any type of work. (Tr. 48–49). At the end of the hearing, the ALJ asked Plaintiff if there was anything he had not asked that she thought was relevant to her case. (Tr. 58). She reminded the ALJ she had lost three family members between 2008 and 2010, and her attorney drew the ALJ's attention to a number of exhibits in the record. (Tr. 58–61).

*VE Testimony*

The VE testified somewhat in the middle of the ALJ hearing. (Tr. 36–41). Before calling the

20

VE to testify, the ALJ asked Plaintiff's counsel, "[D]o you have any specific questions that you'd like to ask before we move to the vocational expert?" (Tr. 35–36). Plaintiff's counsel indicated he would like to discuss the events that led to Plaintiff's 2008 depression, and the ALJ assured him they would come back to that topic. (Tr. 36). The VE testified she had reviewed all the exhibits from Plaintiff's file, and identified Plaintiff's past work as falling under the category of "office clerk" – a light, semi-skilled job with no transferable skills. (Tr. 37). The ALJ's first hypothetical asked the VE to consider a person of Plaintiff's age, education, and work experience, and the RFC to perform a range of medium work subject to a number of physical limitations and the following mental limitations: The person could perform mild to some moderately complex tasks, in a stable environment, without strict pressures to perform, and with only brief and superficial contact with others. (Tr. 38). This RFC represented the RFC assessed by consulting psychologist Dr. Hoyle. (*See* Tr. 288). The VE testified those limitations would eliminate Plaintiff's past work, but would allow the person to perform several jobs: laundry worker (medium, unskilled; 200,000 jobs nationally, 10,000 in the state); kitchen helper (medium, unskilled; 500,000 jobs nationally, 20,000 in the state); and cleaner (medium, unskilled; 900,000 jobs nationally, 28,000 in the state). (Tr. 38–39).

The ALJ then asked the VE to consider a second hypothetical person, with the same physical limitations and the following mental limitations: The person would be unable to meet competitive standards to remember work like procedures, maintain regular attendance and be punctual, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, or complete a normal workday or workweek without psychologically-based interruptions. (Tr. 39). This represented the RFC assessed by Dr. Ike. (Tr. 61, 416–17). The VE testified these limitations would preclude all employment. (Tr. 39). The ALJ asked Plaintiff's attorney if he had

any questions for the VE or would be contending Plaintiff had additional limitations not accounted for in the second hypothetical. (Tr. 40). Plaintiff's attorney answered, "No," to each of these questions, further agreeing that the second hypothetical "[a]bsolutely" represented Plaintiff's alleged scope of limitations. (Tr. 40–41). The ALJ dismissed the VE from the hearing and Plaintiff's attorney finished questioning his client. (Tr. 40–41).

ALJ Decision

The ALJ determined Plaintiff's date last insured to be June 30, 2009. (Tr. 12). He also found she had not engaged in substantial gainful activity since January 30, 2006, more than encompassing her amended alleged onset date of August 2, 2008. (Tr. 12). The ALJ determined Plaintiff suffers from three severe impairments: right knee meniscus tear, fibromyalgia, and bipolar disorder. (Tr. 12). According to the ALJ, however, these impairments do not meet or medically equal a listing. (Tr. 13). Specifically regarding Plaintiff's bipolar disorder, he found Plaintiff has only mild restriction in activities of daily living; moderate social difficulties; moderate difficulties with concentration, persistence, and pace; and no episodes of decompensation. (Tr. 13).

At Step 4, the ALJ determined Plaintiff has the RFC to perform medium work, with some additional limitations. (Tr. 14). In addition to a number of physical limitations, the ALJ found Plaintiff's work must "take[] into account mental limitations allowing the performance of mild to some moderately complex tasks in a stable environment without strict pressures to perform and only brief and superficial contact with others." (Tr. 14). In reaching this determination, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but he found her statements concerning the intensity, persistence, and limiting effects of her symptoms not credible to the extent they are inconsistent with the RFC determination. (Tr.

22

15). To support this finding, the ALJ cited medical records indicating Plaintiff's mood improved on medication, she was learning better coping skills and exercising daily, was satisfied with her medication, and had a GAF of 60. (Tr. 15–16). He also noted Plaintiff only claimed to be disabled as of age 50 in spite of testifying her depression had prevented her from keeping a lasting job for her entire life. (Tr. 16). Additionally, the ALJ cited Plaintiff's daily activities – caring for her husband, self, and pet; driving; cooking and cleaning daily; leaving the house several times a week; and interacting with others in person and by telephone – finding these activities do not support the severity of limitations alleged. (Tr. 16).

The ALJ discussed treating physicians Dr. Dunn and Dr. Ike's highly restrictive assessments, but gave these opinions little weight because he found them inconsistent with Plaintiff's activities of daily living and her presentation at the physical consultative examination. (Tr. 16). Instead, he gave great weight to Dr. Hoyle's opinion that Plaintiff can perform mild to moderately complex tasks in a stable environment, without strict pressures to perform, and with only brief and superficial contact with others, and he incorporated those limitations into his RFC determination. (Tr. 14, 16–17). Further, the ALJ considered but gave "limited weight" to the Third Party Function Report Plaintiff's husband submitted, as his report largely echoed Plaintiff's representation of her limitations and Plaintiff's husband was a non-medical source emotionally invested in Plaintiff's situation. (Tr. 17).

Ultimately, the ALJ determined Plaintiff's RFC leaves her unable to perform her past relevant work as an office clerk. (Tr. 17). Considering Plaintiff's age, education, work experience, and RFC, and based on VE testimony, the ALJ determined Plaintiff can perform jobs existing in significant numbers in the national economy. (Tr. 17–18). Thus, he found Plaintiff not disabled. (Tr.

23

18). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

24

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred a number of ways. First, Plaintiff alleges substantial evidence does not support the ALJ's decision to give little weight to the medical opinions of Plaintiff's treating physicians. (Doc. 14, at 1). Plaintiff also alleges the ALJ unlawfully disregarded the Third Party Function Report her husband completed. (Doc. 14, at 1). Next, Plaintiff contends the record as a whole fails to support the ALJ's finding that Plaintiff can perform jobs existing in significant numbers in the national economy. (Doc. 14, at 1–2). Finally, Plaintiff argues the ALJ failed to

develop a full and fair record and the hearing. (Doc. 14, at 1).

Treating Physician Rule

The ALJ gave little weight to the opinions of Dr. Dunn and Dr. Ike because he found these severely restrictive opinions "inconsistent with the claimant's activities of daily living and her presentation at the physical consultative examination". (Tr. 16). Plaintiff argues substantial evidence does not support this decision, further arguing the ALJ did not articulate specific daily activities he found inconsistent and relied on the function report Plaintiff submitted. (Doc. 14, at 5, 13). Because substantial evidence supports the ALJ's decision to give little weight to the opinions of Dr. Dunn and Dr. Ike and because the ALJ gave good reasons for rejecting these opinions, the ALJ did not err.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(1). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability; (4) consistency; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

26

other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Id.* Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). The "good reasons" an ALJ gives to discount a treating source's opinion must be "supported by the evidence in the case record". *Id.* at 406–07 (quoting SSR 96-2p, 1996 WL 374188, at *5). Failing to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243).

The ALJ gave good reasons for rejecting the opinions of Dr. Dunn and Dr. Ike, stating those opinions were inconsistent with Plaintiff's reported daily activities and her presentation at the physical consultative exam. (Tr. 16). Moreover, substantial evidence supports the ALJ's conclusion as Dr. Dunn and Dr. Ike's opinions indicate someone more severely limited than their treatment records describe.

Plaintiff reported, and the ALJ noted, she can care for herself and her husband and help care for her dog. (Tr. 16, 154). She drives, leaves the house multiple times a week, socializes multiple times a week, shops for household items, cooks simple meals for herself, and performs household chores on a regular basis. (Tr. 155–57). Treatment records also indicate Plaintiff exercises regularly. (Tr. 354, 382). Though Plaintiff's function report stated she does not do much throughout the day, the rest of her function report indicates otherwise. (Tr. 154–57). At the physical consultative

27

examination, Plaintiff had normal mental acuity. (Tr. 278). Plaintiff told the consulting examiner she had been seeing a psychiatrist and was taking medications for bipolar disorder, "*and claim[ed] she [wa]s doing fine*." (Tr. 278) (emphasis added). Further, in spite of stating Plaintiff cannot function normally any percent of the workday (Tr. 416), Dr. Ike never assigned Plaintiff a GAF less than 60 – indicating her symptoms were only moderate even when she experience heightened depression (Tr. 398, 403, 405, 407, 406, 409, 411). There are a number of other inconsistencies regarding Dr. Ike's report. Though he found she has no useful ability to perform at a consistent pace without an unreasonable number and length of rest periods, Plaintiff testified she did not need additional breaks, skip work, or leave work early due to stress at her last job before she quit. (Tr. 45–46, 416). Additionally, Dr. Ike found Plaintiff seriously limited, but not precluded from adhering to basic standards of neatness and cleanliness, but all other records indicate Plaintiff has no problems with personal care, and nothing in the record supports Dr. Ike's assessment that she has any difficulty in this area. Moreover, Dr. Ike's statements that he believes Plaintiff is totally disabled are not medical opinions, as the issue of Plaintiff's disability is one reserved to the Commissioner. (Tr. 343, 431); 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p, 1996 WL 374183, *2.

Dr. Dunn's assessment is contradicted by treatment notes from New Life Counseling, Dr. Zaidi, and Dr. Browning indicating Plaintiff was improving and doing well on Pristiq. (Tr. 205, 224, 226, 353–54, 357, 398). These records note the following: Plaintiff's mood became stable once she started Pristiq (Tr. 205); her bipolar disorder was "getting better" and she felt she had improved 80 to 90% (Tr. 224, 226); she was exercising (Tr. 205, 224, 354); she was doing well, wanted to move closer to her family, and her family and husband could see she was doing better (Tr. 353); she felt better than when she started counseling (Tr. 354); she was smiling, staying busy, and working on

28

a project (Tr. 357); she was seeing friends, playing cards, and "using [her] support system optimally" (Tr. 357); she was doing well on current medications (Tr. 398, 401); she was motivated to improve her condition (Tr. 360); and she went on a vacation to South Carolina (Tr. 359). Further, Dr. Dunn even agreed Plaintiff's food preparation and hygiene are normal, and she can complete household chores when she feels able. (Tr. 277).

While both doctors found she would have difficulty with the stress and pressure of a job, the ALJ's RFC takes this into account, limiting Plaintiff to mild to some moderately complex tasks, in a stable environment, without strict pressures to perform, and with only brief, superficial contact with others. (Tr. 14). All in all, Plaintiff's daily activities – as reported by herself and her husband, and as reflected in medical records – do not support the severity of allegations she alleges. Plaintiff alleges she is totally disabled due to mental impairments; yet she told the physical consulting examiner she was doing fine on her psychiatric medications, she socializes multiple times a week, she drives and shops, she does not need help remembering to take her medication, and she cooks simple meals and performs household chores. By explaining that he gave Plaintiff's treating physicians little weight due to inconsistencies with her daily activities and presentation at the consultative examination, the ALJ gave good reasons, supported by substantial evidence, for his conclusion. Thus, he did not err.

Third Party Function Reports

"[P]erceptible weight must be given to lay testimony *where . . . it is fully supported by the reports of treating physicians*." *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1054 (6th Cir. 1989) (emphasis added). Plaintiff alleges the ALJ erred by rejecting the Third Party Function Report Plaintiff's husband submitted. (Doc. 14, at 1). She also argues the ALJ erred by not

29

explaining what weight he gave to the opinion of Plaintiff's former supervisor, Ms. Blank. (Doc. 14, at 3). Neither of these contentions has merit.

Regarding the report Plaintiff's husband submitted, the ALJ gave it "limited weight" because it was from a non-medical source emotionally invested in Plaintiff's situation, and largely echoed Plaintiff's representation of her limitations. (Tr. 17). Plaintiff argues the ALJ should have explained why that was a reason for limiting its weight and states a plaintiff's family will always be emotionally invested. (Doc. 14, at 13–14). Plaintiff also suggests Plaintiff's husband's report did not echo her representations of limitations, attempting to show distinctions because Plaintiff reported she takes care of her husband and dog, and Plaintiff's husband checked a "no" box when asked whether Plaintiff takes care of anyone else. (Doc. 14, at 14; Tr. 179).

Despite this discrepancy, Plaintiff's husband's report did contain largely the same information as Plaintiff's own report regarding her limitations. Both reports indicate problems coping with stress and changes in routine, problems with concentration, and some socialization problems (Tr. 144, 157–60, 181–84), and both reports state Plaintiff can perform household chores, cook simple meals for herself, drive, and complete personal care tasks without problems. (Tr.154–57, 180–83). As discussed while evaluating the ALJ's considerations of treating physician opinions, both Plaintiff's activities report and her husband's report show daily activities inconsistent with someone totally disabled due to mental impairments. For that reason, the ALJ did not err by giving his opinion only limited weight. While family members will always be emotionally invested, the fact remains that Plaintiff's husband's report largely reiterates Plaintiff's report, and both describe a level of activity exceeding that of someone totally disabled by mental impairments.

Plaintiff also notes the ALJ discussed the report submitted by Plaintiff's former supervisor,

30

Ms. Blank, but emphasizes the ALJ "never addresse[d] what weight" he gave the opinion or if he rejected it. (Doc. 14, at 3). This was not error. Ms. Blank's report described the difficulties Plaintiff experienced with stress at her former job, indicating she ultimately left the job because she could not handle it. (Tr. 429). Consistent with this report, the ALJ found Plaintiff's mental limitations preclude her from performing her past work as a window clerk. (Tr. 17). Also consistent with this report regarding Plaintiff's on-the-job stress, the ALJ found Plaintiff can only perform jobs involving (1) mild to moderately complex tasks; (2) a stable environment; (3) no strict pressures to perform; and (4) only brief and superficial contact with others. (Tr. 14). Thus, the ALJ clearly gave some weight to Ms. Blank's opinion regarding Plaintiff's inability to perform her past work, incorporated her report into his decision, and did not err in assessing it.

Substantial Evidence Supports RFC & Determination Significant Number of Jobs Exist

Plaintiff argues substantial evidence does not support the ALJ's conclusion that she can perform jobs existing in significant numbers in the national economy. (Doc. 14, at 1). However, substantial evidence does support the ALJ's conclusion. Plaintiff retains the RFC to perform work subject to a number of mental limitations, and the ALJ appropriately relied on the VE's testimony regarding the number of positions available for a person with Plaintiff's limitations. As described above, the opinions of Dr. Dunn and Dr. Ike describe someone much more limited than their treatment records suggest Plaintiff is. Specifically, Dr. Ike always assessed Plaintiff a GAF score of 60, indicating only moderate symptom severity (Tr. 398, 403, 405, 407, 406, 409, 411), counseling and medical records show Plaintiff was doing well on Pristiq, exercising, talking to family members, working on projects, and generally improving (Tr. 205, 224, 226, 353–54, 357, 398), and Plaintiff told the psychical consulting examiner she was doing fine on her bipolar

31

medications (Tr. 278). These facts are inconsistent with someone who cannot function at all in any work setting.

Moreover, Plaintiff's and Plaintiff's husband's function reports indicate a level of daily activities inconsistent with someone completely disabled due to mental impairments. All records – including reports from Plaintiff and her husband (Tr. 157–60, 180–84), counseling records (Tr. 201, 350, 355), physician opinions (Tr. 274–77, 286–87, 329, 415–17, 343), and Ms. Blank's note describing Plaintiff's on-the-job stress (Tr. 429) – indicate Plaintiff has some social difficulties, does not adapt well to change, and cannot perform in a stressful work environment where she interacts frequently with others. Plaintiff has never before held a position that would fall under this range of limitations, and has never considered such a job. (Tr. 29, 48, 145). The ALJ accommodated these limitations by finding Plaintiff cannot perform her past relevant work and restricting her to mild to moderate tasks, a stable work environment, no strict pressures to perform, and only brief and superficial contact with others. (Tr. 14, 17).

The ALJ presented the VE with a hypothetical representing the physical and mental limitations he ultimately determined Plaintiff has. (Tr. 38). The VE testified about multiple positions a person with Plaintiff's limitations could still perform, and each of these positions exist in significant numbers in the national economy. (Tr. 38–39). "A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). While the VE testified someone as disabled as Dr. Ike described Plaintiff to be would be precluded from any employment (Tr. 39), that description represents someone far more limited than the person described in Plaintiff's

medical records and function reports. Thus, the ALJ did not err in finding Plaintiff not disabled because despite her limitations, she can still perform jobs existing in significant numbers in the national economy.

Full and Fair Record

Plaintiff – who was represented by counsel at the ALJ hearing – alleges the ALJ failed in his duty to fully develop the record because she contends the questioning at the hearing was superficial and did not inquire enough about her functional limitations. (Doc. 14, at 5–9, 12–13). Specifically, Plaintiff argues, "[Plaintiff] had counsel, but counsel could not have known the ALJ was going to rely on purely [Plaintiff's function report]" to determine what her limitations were on her alleged onset date. (Doc. 14, at 15). However, the ALJ asked Plaintiff's counsel multiple times if there were other questions to ask or topics to cover. Before he called the VE, the ALJ asked Plaintiff's counsel if he had specific questions, and the ALJ assured Plaintiff's counsel they would return to a discussion of the events that worsened Plaintiff's depression in 2008. (Tr. 35–36).  At the end of the VE's testimony, Plaintiff's counsel stated, "I'll just inquire as my client and we'll go from there". (Tr. 40). The ALJ stopped him and said, "Oh, but did you have any questions for the [VE]?" (Tr. 40). Plaintiff's counsel replied, "No, I did not", and the ALJ then dismissed the VE from the hearing. (Tr. 40). Before continuing the hearing, the ALJ ensured Plaintiff's counsel would not be alleging Plaintiff suffered additional limitations "that may not have been in the second hypothetical". (Tr. 40). Plaintiff's counsel assured him the second hypothetical "[a]bsolutely" covered all the alleged limitations. (Tr. 41).

Toward the end of the hearing, the ALJ asked Plaintiff, "Is there anything that I haven't asked that you think is relevant that you'd like to discuss at this time?" (Tr. 58). Plaintiff reiterated

her family losses between 2008 and 2010. (Tr. 58). Plaintiff's attorney interjected and directed the ALJ's attention to Dr. Ike's opinion that Plaintiff's family losses contributed to the severity of her condition. (Tr. 58–59). Before the hearing ended, Plaintiff's attorney interjected one other comment, again directing the ALJ to Dr. Ike's opinion that Plaintiff has no ability do deal with ordinary work stressors, and the ALJ confirmed that was the assessment he used for the second hypothetical. (Tr. 61).

Plaintiff's counsel had more than ample opportunity to direct the questioning toward Plaintiff's functional limitations and did not do so, though he did address a number of topics and ensured Dr. Ike's opinion had been used to create the second hypothetical posed to the VE. (Tr. 35–36, 40–41, 58, 61). Because the ALJ reasonably allowed Plaintiff's attorney every opportunity to ask any questions he wished to ask of Plaintiff and the VE, the ALJ did not fail in his duty to develop a fair and full record. *See, e.g., Chandler v. Comm'r of Soc. Sec.*, 124 F. App'x 355, 359 (6th Cir. 2005) (no due process violation where the ALJ gave the plaintiff the opportunity to cross-examine the expert).

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying SSI benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp, II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638

F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).